# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANGELA KATHLEEN MOORE,   )<br>                                            )<br>        Plaintiff,                      )<br>                                            )<br>        v.                                 )<br>                                            )<br>CAROLYN W. COLVIN,             )<br>Acting Commissioner of Social Security,  )<br>                                            )<br>        Defendant.                   ) | Case No. 11 C 5412<br><br>Magistrate Judge Daniel G. Martin |

## MEMORANDUM OPINION AND ORDER

Plaintiff Angela Kathleen Moore (Moore) seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income (SSI). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Because the administrative law judge's decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**I.     Background**

Moore was born on June 23, 1967 and suffers primarily from mental impairments (including depression, post-traumatic stress disorder, and bipolar disorder) and also chronic low back pain. (R. 36, 187). Moore has been regularly treated for her mental impairments. Moore is on numerous psychotropic medications and has been hospitalized for psychiatric treatment on three occasions for suicide attempts and suicidal ideation. Moore also has an "extensive" history of both alcohol and prescription pain medication abuse. (R. 312, 334, 475, 907, 913).

The record reveals that Moore had a troubled childhood. She is a victim of childhood sexual abuse by her father and other family members, resulting in her father's imprisonment. (R. 428, 791). Moore was physically abused by her brother, mother, and father and also witnessed her father beat her mother, stepmother, and siblings. (R. 428, 674). Moore's mother, father and stepmother were

alcoholics. (R. 426, 900, 901). Moore's mother also suffered from depression and attempted suicide by overdosing when Moore was about 10 years old. (R. 674, 708, 901, 949).

Moore's difficulties persisted into adulthood. When Moore was 26 years old, her first husband committed suicide by shooting himself with a shot gun. (R. 397, 674, 900). Moore's younger sister was murdered in approximately November 2004. (R. 397, 760, 786). Moore's second husband suffered an eye injury at work in March of 2005 and has not worked since then. (R. 673, 786, 841). Between April 2007 and November 2007, Moore was hospitalized three times for suicide attempts or suicidal ideation. (584, 760-61, 786). Moore's brother was murdered on February 16, 2010. (R. 954).

At the administrative hearing on March 10, 2010, Moore testified that her bipolar disorder makes her "an extremely grouchy person" who "want[s] to take things out on others." (R. 54-55). Moore also suffers flashbacks regarding the childhood sexual abuse she experienced. (R. 81, 899). Despite improvement on medication, Moore still has thoughts of suicide. (R. 55-56, 75, 903). Moore's second husband, Carl Johnson, testified that Moore sleeps most of the day, is unable to do housework, and "just can't function." (R. 87-88, 89-90). Johnson indicated that Moore gets "panicky" and "paranoid" when they are out in public. (R. 88, 91). Johnson locks up Moore's medications and dispenses them to her on a weekly basis. (R. 88-89). Despite Moore's severe mental impairments, no mental health medical expert testified at the administrative hearing. (R. 95).

Moore completed the eleventh grade and obtained a GED. (R. 38, 295, 842). Moore also took two years worth of classes at a community college but never received her culinary arts degree. Id. Moore has past work experience as a cleaner, order picker filing orders, and salad preparer at a restaurant (R. 40-41). Moore has a driver's license but testified that she does not drive because of all the medications she is taking. (R. 39). Moore applied for SSI on August 4, 2008, alleging she became totally disabled on July 22, 2008 because of degenerative disc disease, a bulging disc,

depression, post-traumatic stress disorder, and bipolar disorder. (R. 187, 217). Moore's application was denied at the initial and reconsideration levels. (R. 111-17, 121-24, 253).

Under the required five-step analysis used to evaluate disability, ALJ Sylke Merchan found that Moore had not engaged in substantial gainful activity since her alleged onset date of July 22, 2008 (step one); her degenerative disc disease, depression, bipolar syndrome, post-traumatic stress disorder (PTSD), and asthma are severe impairments (step two); but that they did not qualify as a listed impairment (step three). (R. 12-14). The ALJ determined that Moore retained the residual functional capacity (RFC) to perform light work except no climbing ladders, ropes or scaffolds; can perform all other postural functioning on an occasional basis; avoid concentrated exposure to environmental irritants; can perform simple, routine, and repetitive tasks; can have occasional contact with supervisors, the public, and coworkers; and can work in an environment with relaxed/flexible (low stress) production requirements and few, if any, workplace changes. (R. 14). Given this RFC, the ALJ concluded that Moore was unable to perform her past relevant work as a salad preparer, order picker, and janitor (step four). (R. 20). The ALJ found there were jobs that exist in significant numbers in the economy that Moore could perform considering her age, education, work experience, and residual functional capacity, including hand packer, hand sorter, and cleaner (step five). (R. 20-21). The Appeals Council denied Moore's request for review on June 14, 2011. (R. 1-6). Moore now seeks judicial review of the final decision of the Commissioner, which is the ALJ's ruling. O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

**II.    Discussion**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine

whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step sequential inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence, based upon a legal error, or too poorly articulated to permit meaningful review. Hopgood ex rel. v. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In its substantial evidence review, the court critically reviews the entire administrative record but does not reweigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its own judgment for that of the Commissioner. Clifford, 227 F.3d at 869. An ALJ's credibility determination is generally entitled to deference and will not be overturned unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).

The ALJ denied Moore's claim at step five, finding that Moore retains the RFC to perform a range of light work. Moore challenges two main aspects of the ALJ's decision: (1) the ALJ erred in evaluating her mental limitations at step three and (2) the ALJ erred in assessing Moore's residual

functional capacity by failing to consider all of her impairments in combination and declining to accord controlling weight to the opinion of her treating psychiatrist. Because there is not substantial evidence in the record to support the ALJ's decision with respect to the B criteria and the mental component of the RFC determination, a remand is required.

### A. Listing Determination

Moore challenges the ALJ's step three finding that her mental impairments do not meet or medically equal Listings 12.04 or 12.06. Listing 12.04 addresses affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. To establish an affective disorder under Listing 12.04, a claimant must meet both the "A" and "B" criteria identified in the listing or the "C" criteria. Id. Listing 12.06 concerns anxiety related disorders. "In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. The required level of severity is met for Listing 12.06 when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. Id.

The ALJ determined that Moore's severe impairments included depression, bipolar syndrome, and PTSD, but ultimately found that her mental impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06. (R. 12-14). Specifically, the ALJ found that Moore suffers from mild restrictions in daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, and pace, and experienced no episodes of decompensation of extended duration. (R. 13-14). The ALJ determined that Moore did not satisfy the B criteria or C criteria of Listings 12.04 or 12.06 (R. 14).

Moore faults the ALJ for failing to assess the A Criteria when analyzing her mental impairments under Listings 12.04 and 12.06. The ALJ's step three finding that Moore did not meet or medically equal the requirements of the Listings was based on her determination that Moore did not meet the B Criteria and the C Criteria. (R. 13-14). Moore is correct that the ALJ did not directly address whether Moore met the Paragraph A Criteria, apparently assuming that she had. The ALJ's omission in this regard is harmless. Once the ALJ determined that Moore did not meet the B Criteria and the C Criteria, there was no need to discuss the A Criteria. <u>Berger v. Commissioner of Social Sec.</u>, 2009 WL 2600087, at *7 (S.D. Ind., Aug. 21, 2009) (then-district Judge Hamilton); <u>Flynn v. Astrue</u>, 563 F.Supp.2d 932, 941 (N.D. Ill. 2008).

**B.     Mental Opinion Evidence of Drs. Boyenga and Hilger**

The ALJ stated that she gave "some weight" to the opinion of Dr. Kirk Boyenga, state agency psychological consultant. (R. 20). Dr. Boyenga completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on November 7, 2008. (R. 845-62). Dr. Boyenga determined that Moore had only mild restriction of activities of daily living, mild difficulty maintaining social functioning, moderate difficulty maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 855). Dr. Boyenga concluded:

> Claimant is capable of performing simple tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. Claimant relates well with family and friends. Adaptation abilities are limited, but allow routine, repetitive tasks. Claimant can follow instructions. Travel is reported to be limited; however, claimant is able to go to familiar locations.

(R. 861).

In her discussion as to why Moore's mental impairments failed to meet the B Criteria and C Criteria of Listings 12.04 and 12.06, the ALJ did not address the bulk of Moore's mental health records, including evidence of arguable decompensation episodes and three psychiatric hospitalizations that occurred the year prior to her onset date. (R. 13-14). Rather, as to episodes

of decompensation, the ALJ observed that "[t]here is no evidence in the record showing that the claimant has had any episodes of decompensation of the requisite duration during the time pertinent to this decision." (R. 14). The ALJ generally limited her analysis of the mental health evidence to records after the onset date. The ALJ's RFC finding incorporated limitations of simple, routine, and repetitive tasks, occasional contact with supervisors, the public, and coworkers, an environment with relaxed/flexible (low stress) production requirements and few if any workplace changes based on Moore's mental health condition. (R. 14). The ALJ noted that the mental component of the RFC assessment reflected the mental limitations that Dr. Boyenga found. (R. 20).

Although the ALJ said she was giving "some weight" to Dr. Boyenga's opinion, she essentially adopted his opinion as to the B Criteria except that she concluded that Moore is moderately limited in the ability to maintain social functioning, as opposed to Dr. Boyenga's finding that Moore is mildly limited in this area. (R. 13, 20, 855). No other physician other than Dr. Boyenga provided an assessment with regard to the B Criteria of Listings 12.04 and 12.06. Thus, the only medical opinion that could support the ALJ's determination of Moore's functional limitations under the B Criteria is the opinion of non-examining agency psychologist Dr. Boyenga.

The ALJ's significant reliance on Dr. Boyenga's assessment is problematic because Dr. Boyenga did not have access to Moore's complete medical record, and the ALJ did not indicate that she had considered that fact in crediting his opinion.[1] The applicable regulation provides that when evaluating nonexamining source opinions, the ALJ shall "evaluate the degree to which these opinions consider all of the pertinent evidence in [the] claim, including the opinions of treating and other examining sources." 20 C.F.R. § 416.927(c)(3); see also 20 C.F.R. § 416.927(c)(6) (stating one of the factors to consider in determining the weight to give a medical opinion is "the extent to

---

[1] In contrast, the ALJ noted that the medical expert, Dr. Walter J. Miller, who provided testimony regarding Moore's physical condition, provided "a thorough analysis of the record as it related to the physical impairments." (R. 20, 95).

which an acceptable medical source is familiar with the other information in your case record.").

Dr. Boyenga did not have Moore's most recent mental health treatment records. Dr. Boyenga wrote that "Will co Mntl Hlth - did not respond to repeated requests for medical evidence." (R. 857). Dr. Boyenga discounted Moore's credibility because she "present[ed] no corroborating evidence of current treatment." Id; see also (R. 861) (Dr. Boyenga noting that Moore "does report that she goes to mental health center for treatment, but does not document that."). Moore was first seen at the Will County Health Department in July of 2007. (R. 873). At the administrative hearing, Moore testified that she meets with her treating psychiatrist, Dr. Andrew Guschwan of the Will County Health Department, twice a month and a therapist once or twice a week. (R. 51-54). On March 8, 2010, Dr. Guschwan opined that Moore is unable to work because of her difficulties maintaining concentration and social functioning. (R. 954).

Dr. Boyenga was also unfamiliar with Moore's third suicide attempt which occurred less than a year prior to her onset date. Moore's third suicide attempt occurred on November 19, 2007 and Dr. Boyenga's assessment was rendered on November 7, 2008, but he did not mention that Moore had a third suicide attempt and her resulting inpatient psychiatric treatment at Silver Cross Hospital. See (R. 857) (stating "Silver Cross Hospital – admits 4/07 and 5/07, 10/07 PHP for depression."). The unreviewed medical record is sufficiently significant that consideration of Moore's entire mental health records may have altered Dr. Boyenga's conclusions regarding Moore's mental RFC, including his B criteria findings. Buechele v. Colvin, 2013 WL 1200611, at *12 (N.D. Ill. March 25, 2013) (citing cases holding remand necessary where ALJ relied upon non-examining state agency physician opinion that was based on an inadequate review of the medical record.).

Another problem with the ALJ's reliance on Dr. Boyenga's mental assessment is that it was was based on the one-time psychological consultative examination by Dr. William N. Hilger, Ph.D., who reviewed only medical records from a single date (April 23, 2007) prior to conducting his

-8-

evaluation. (R. 857). Dr. Hilger took a history, administered basic mental status testing, and conducted a mental status examination of Moore on October 14, 2008. (R. 840-44). Dr. Hilger's examination lasted one hour. (R. 840). Despite finding that Moore's immediate to remote memory was "fair to minimal," Dr. Hilger apparently relied on Moore to adequately recount her history of mental illness. (R. 842); see also (R. 66) (Moore describing her memory as "horrible" at the administrative hearing); (R. 214) (report from social security interview noting Moore had "[m]emory issues – had to call home to get phone number for neighbor and she didn't remember doctor's name or address or phone number."). Dr. Hilger noted that Moore "appeared somewhat defensive and evasive in providing information." (R. 840).

Upon mental examination, Dr. Hilger found Moore had fair to minimal immediate to remote memory, minimal general knowledge, minimal calculational ability, fair conceptual reasoning, fair abstract reasoning, and fair judgment. (R. 842-43). Dr. Hilger wrote that Moore "appear[ed] to have fair mental potential, but no motivation to pursue or perform any work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation." (R. 844). Dr. Hilger diagnosed Moore with adjustment reaction of adulthood with mild depression due to loss of employment and other family circumstances (Axis I); estimated low average intellectual functioning (Axis II); alleged back pain condition with no pain behavior or invalidism observed (Axis III); psychosocial stressors, moderate, due to lack of employment and income in her and boyfriend (Axis IV); and current GAF score of at least 55-60, if not higher (Axis V). (R. 843).

Dr. Boyenga's reliance on Dr. Hilger's consultative report is problematic because Dr. Hilger based his opinion of Moore on an incomplete picture of Moore's condition. Dr. Boyenga did not mention the limited record provided to Dr. Hilger. In his report, Dr. Hilger indicated that the only information he reviewed was an Adult Disability Report completed by Moore and medical records

from St. Joseph's Medical Center, dated April 23, 2007 (Moore's first suicide attempt). (R. 840). Dr. Hilger did not review a significant volume of treatment notes and other records from Moore's two subsequent psychiatric hospitalizations at Silver Cross Hospital in May and November, 2007 for a suicide attempt and suicidal ideation. The only reference to Moore's two in-patient hospitalizations at Silver Cross Hospital is one sentence in which Dr. Hilger said "[s]he was also treated at Silver Cross Hospital after [the St. Joseph's hospitalization] for similar reasons." (R. 841).

Also disturbing is that Dr. Hilger formed an opinion regarding Moore's mental status without having her most recent mental health records from Will County Mental Health Center, including information concerning the dosage levels of Moore's medications. Dr. Hilger's report noted that Moore "did not bring her medicines, but claimed to be taking medications of Cymbalta, Abilify, Lorazepam, Benztropine and Trazodone, but did not know the doses of the medicines." (R. 841). The Will County Mental Health Center records omitted from Dr. Hilger's review include Moore's treating psychiatrist's diagnoses of Bipolar Disorder-Most Recent Episode Depressed With Psychotic Features and Post-Traumatic Stress Disorder as well as his opinion that Moore is unable to work. (R. 954). Dr. Hilger seemed unaware that Moore's has confirmed diagnoses of bipolar disorder and posttraumatic stress disorder. In this regard, he mentions only that Moore applied for disability benefits "due *allegedly* [to] degenerative disc disease, depression, PTSD, and a bipoloar disorder." (R. 840) (emphasis added).

Dr. Hilger should have been provided with Moore's complete mental health records. 20 C.F.R. § 416.917 (stating "[i]f we arrange for [a consultative] examination or test . . . [w]e will also give the examiner any necessary background information about your condition."); Nalley v. Apfel, 100 F.Supp.2d 947, 953 (S.D. Ohio 2000) (stating "when a claimant is sent to a doctor for a consultative examination, all the available medical records should be reviewed by the examiner."). As Magistrate Judge Newman explained in finding that a consulting psychological examiner's

opinion did not constitute substantial evidence where he did not have access to most of the claimant's prior mental health treatment records:

> In a mental impairment case, a plaintiff's prior treatment records are even more important than in a case involving a physical impairment which is usually more easily visible to the examining physician. It is quite often the case that the severity, or even the expression, of mental problems will vary from day to day. Thus, an opinion on apparently long-standing mental problems given after only a one-shot examination, *without recourse to the prior treatment records*, is not one which can generally be relied upon.

Poole v. Astrue, 2012 WL 3862519, at *6 (E.D. Cal. Sept. 5, 2012).[2]

In sum, Drs. Boyenga's and Hilger's mental assessments of Moore were not based on a sufficiently complete record of her condition, and the ALJ should have given limited weight to their findings. Neither Dr. Boyenga nor Dr. Hilger reviewed any records from Moore's treating psychiatrist, Dr. Guschwan, when evaluating Moore's mental impairments. Although the ALJ did not explicitly credit Dr. Hilger's opinion, it was factored indirectly into the ALJ's decision as part of Dr. Boyenga's opinion upon which the ALJ did rely. Because the only mental opinion evidence in support of the B Criteria findings and the translation of those findings into a specific mental RFC determination is compromised, the ALJ's findings in those regards are not supported by substantial evidence. Richards v. Astrue, 370 Fed. Appx. 727, 730 (7th Cir. 2010) (stating the court was most significantly "troubled that the ALJ rated Richard's mental functional limitations without the benefit of any medical professional's assessment of her mental RFC."); Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004) (stating "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."). Upon remand, the ALJ shall further

---

[2] Incidentally, this is not the first time Dr. Hilger's opinion has been discounted because of an incomplete review of a claimant's medical records prior to a psychological consultative examination. See Chinderele v. Astrue, 2011 WL 4396914, at *7 (N.D. Ill. Sept. 20, 2011) (stating that "[t]he Court is troubled that the only record provided to Dr. Hilger was the WCHD psychiatric evaluation conducted in August 2006, which assigned a GAF score of 70. Dr. Hilger was not provided with the records from Tinley Park Mental Health Center or the July 2006 WCHD clinical assessment, which assigned a GAF score of 40.").

develop the record to include the opinion of a state agency psychologist based on a review of Moore's entire mental health record.

Dr. Boyenga's report is troubling in another respect. Dr. Boyenga twice noted in his findings that Moore "did not appear at all depressed at a recent CE [by Dr. Hilger]." (R. 857). In his report following the consultative examination, Dr. Hilger remarked that Moore "exhibited a somewhat euthymic mood with intermittent laughing and joking and certainly did not appear serious[ly] depressed as alleged." (R. 840). This reliance on Moore's appearance at a single, one hour consultative examination demonstrates a fundamental misunderstanding of the episodic nature of mental illness and specifically, Moore's bipolar disorder. "The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better of has had a 'good day' does not imply that the condition has been treated." Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011). The Seventh Circuit has repeatedly emphasized the necessity of taking into account the episodic nature of many chronic mental conditions:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. . . . That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment."

Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008); see also Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011) (stating "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.").

As in Bauer, Moore is a person with a chronic psychiatric disease, who is under continuous treatment with heavy drugs, who is likely to have good days and bad days, and who is likely to show some improvement on occasion. Bauer, 532 F.3d at 609. On remand, the ALJ shall reevaluate all the evidence pertaining to Moore's mental impairments, considering the fluctuating nature of mental illness and especially bipolar disorder. Phillips v. Astrue, 413 Fed.Appx. 878, 886 (7th Cir. Dec. 23,

2010) (noting many mental illnesses "are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."). The ALJ shall also consider upon remand Moore's ability to maintain regular attendance and the vocational expert's testimony that there would be no jobs available for an individual who would be absent more than three days a month due to mental impairments. (R. 106).

### C. Treating Psychiatrist Andrew Guschwan's Opinion

Turning next the ALJ's handling of the treating psychiatrist's opinion, Moore argues that the ALJ inadequately evaluated Dr. Andrew Guschwan's opinion that Moore is unable to work. A treating physician's opinion is entitled to controlling weight if it is supported by objective medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. 416.927(c)(2). The Seventh Circuit has explained in Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006): "Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradictory evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." Id. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." Id. at 377.

If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 416.927(c)(1)-(6). This "checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much actual weight to

give it, there seems no room for him to attach a presumptive weight to it." Hofslien, 439 F.3d at 377. Finally, a claimant is not disabled simply because his treating physician says so. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001); 20 C.F.R. § 416.927(e)(1). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Dixon, 270 F.3d at 1177 (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)).

On March 8, 2010, Dr. Andrew Guschwan, Moore's treating psychiatrist, of the Will County Behavioral Health Center indicated that Moore's primary psychiatric diagnosis is Bipolar Disorder-Most Recent Episode Depressed with Psychotic Features. (R. 956). Moore also has a second psychiatric diagnosis of Post-Traumatic Stress Disorder (PTSD). Id. Dr. Guschwan explained that "[r]ecently, it has been difficult for Angela to maintain psychiatric stability." Id. Dr. Guschwan stated that Moore reports experiencing decreased energy, feelings of worthlessness, difficulty concentrating, isolating, sleep disturbance and suicidal thoughts. Id. Dr. Guschwan noted that "due to being sexually abused during much of her early life, Angela has experienced symptoms of PTSD." Id. Dr. Guschwan wrote: "She reports she has felt intense fear due to the past abuse. She also has intrusive thoughts, dreams and flashbacks associated with her past abuse. Ms. Moore also reports, at times she experiences auditory hallucinations and paranoia." Id. Dr. Guschwan confirmed that Moore is prescribed Cymbalta 6 mg in the AM; Abilify 10 mg in the AM; Trazadone 100 mg at night time; Lorazapam 1 mg three times a day; and Cogentin 1 mg twice a day. Id. Dr. Guschwan explained that medications are prescribed "in an attempt to psychiatrically stabilize [Moore's] psychiatric symptoms." Id. Dr. Guschwan opined that "[d]ue to her serious mental health condition, her difficulty maintaining concentration and her difficulties maintaining social functioning, Angela is unable to work." Id.

The ALJ rejected Dr. Guschwan's opinion that Moore is unable to work. (R. 19). Because controlling weight was not given to the opinion of Dr. Guschwan, the Court looks to whether the ALJ adequately articulated the reasoning for assigning the weight she did. The ALJ stated that she had given "some weight" to Dr. Guschwan's opinion that Moore has difficulty maintaining concentration and social functioning. Id; see Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) (noting that ALJ opinion giving "some weight to treating physician's opinion" was "unhelpful."). The ALJ gave one reason for rejecting Dr. Guschwan's opinion regarding the extent of Moore's mental limitations. The ALJ found Dr. Guschwan's opinion about Moore's inability to work to be inconsistent with GAF scores assessed under his care, scores that ranged from 55 to 65, indicating moderate but not severe symptoms or difficulty in social, occupational and school functioning. (R. 19-20).

Although consistency with the record is an important factor when assessing the weight to give a treating physician's opinion, the regulations require the ALJ to weigh all of the factors provided in 20 C.F.R. § 416.927. See 20 C.F.R. § 416.927(c)(4) (stating "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); SSR 96-2p (stating "[e]ven if the treating source's opinion is not given 'controlling weight' . . . , the opinion is still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927."). The ALJ did not explicitly address any of the other checklist of factors in assessing what weight to give Dr. Guschwan's opinion. Bauer, 532 F.3d at 608 (stating that when the treating physician's opinion is not entitled to controlling weight "the checklist comes into play."). Because a remand is necessary to develop new mental opinion evidence and reevaluate the evidence pertaining to Moore's mental impairments, the ALJ shall take the opportunity to fully consider and apply all of the required checklist of factors and if necessary, reevaluate the opinion of Moore's treating psychiatrist. If the ALJ has any questions about the weight to give Dr. Guschwan's opinion, she may recontact him. See Barnett v. Barnhart, 381 F.3d

664, 669 (7th Cir. 2004) (stating "although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary.").

### D. Remaining Issues

The Court declines to address the remainder of Moore's arguments. On remand, Moore may raise her arguments regarding any alleged remaining errors. 20 C.F.R. § 416.1483 (stating that when a case is remanded from federal court, the ALJ may consider "[a]ny issues relating to your claim.").

## III. Conclusion

For these reasons, Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [34] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Angela K. Moore and against Defendant Acting Commissioner of Social Security.

**E N T E R:**

*Daniel G. Martin*

**Daniel G. Martin**
**United States Magistrate Judge**

**Dated: June 12, 2013**